UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | § | |
| | § | |
| Plaintiff, | § | CIVIL ACTION NO.: 1:21-cv-541 |
| v. | § | |
| | § | |
| SOUTHWESTERN UNIVERSITY and | § | |
| SHELLEY STORY, | § | **JURY TRIAL DEMAND** |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S ORIGINAL COMPLAINT AND JURY DEMAND

Plaintiff John Doe ("John"),[1] by and through counsel, and for his Complaint against Defendants Southwestern University ("Southwestern" or the "University") and Shelley Story ("Dean Story") (together with Southwestern, the "Defendants"), states as follows:

### INTRODUCTION

1.     This Complaint arises out of damages inflicted by Southwestern's biased and discriminatory investigative process, as overseen by Dean Story, after non-party Jane Roe ("Jane") made a false and retaliatory complaint of sexual misconduct against John.

2.     Jane, a woman with no affiliation with Southwestern, filed her complaint with the University after John made clear that he did not want a personal relationship with her.

3.     Dean Story initiated Southwestern's Title IX investigative process, even though the University lacked jurisdiction over Jane's complaint.

4.     Southwestern found John responsible by crediting Jane's false and unsubstantiated allegations.

---

[1] A Motion to Proceed Under Pseudonym and for Protective Order is being filed concurrently with this Complaint in order to protect John's identity and that of his accuser.

5.      Southwestern unlawfully expelled John.

6.      John, a collegiate golfer, has lost his last opportunity to play NCAA golf.

7.      John now files this Complaint against Southwestern, alleging that its conduct violated Title IX and Texas state law. John also makes a claim of negligence against Dean Story given her breaches of the legal duty she owed him.

8.      John is seeking declaratory and injunctive relief to remedy Southwestern's actions, in the form of his expulsion being vacated and all record of it removed, as well as monetary damages from Southwestern and Dean Story.

## PARTIES

9.      John is a senior, college athlete at Southwestern with one semester remaining prior to graduation and a resident of Texas. John is also a former recipient of a scholarship from Southwestern. He was expelled from the University on May 4, 2021.

10.     Southwestern is a private university located within the Western District of Texas. Defendant Southwestern may be served through its registered agent, Capitol Corporate Services, Inc. at 206 E. 9th St., Ste. 1300 Austin, TX 78701.

11.     Dean Story is Southwestern's Dean of Students and resides in the Western District of Texas. She may be served personally at 1509 Watercrest Dr. Georgetown, TX 78626 or wherever she may be found.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over the subject matter of this action: (i) under 28 U.S.C. §§ 1331 and 1343 because this action arises, in part, under the laws of the United States—Title IX of the Education Amendments Act of 1972 ("Title IX"), 20 U.S.C. §§ 1681 *et seq.* and 42 U.S.C. § 1983; and (ii) pursuant to the principles of supplemental jurisdiction under 27 U.S.C. § 1367.

2

13.     This Court has personal jurisdiction over Southwestern as it conducts business in the State of Texas.

14.     This Court has personal jurisdiction over Dean Story as she is a resident of Texas.

15.     This Court is authorized to grant the declaratory relief sought under 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57 and 65.

16.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(1) and (2).

## BACKGROUND FACTS
### Title IX Enforcement

17.     On April 11, 2011, the United States Department of Education's Office for Civil Rights ("OCR") issued its now infamous "Dear Colleague Letter," which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX, the statute that forbids discrimination on the basis of sex by institutions that accept federal funding ("Dear Colleague Letter" available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-201104.html).

18.     Educational institutions designed to educate America's youth are ill-equipped to adjudicate allegations of sexual assault, remain wary of bad publicity, and continue to overreact to the threat of federal investigations, sanctions, and lawsuits, in part by discriminating against male students on the basis of their sex.

19.     Southwestern is particularly susceptible to this public pressure.

20.     Southwestern students engaged in a series of protests in 2015 following the University's response to claims of sexual misconduct arising from a fraternity event.

21.     In response to these 2015 protests, the university formed a committee of students and staff to revise Southwestern's sexual violence policy. Those proposed revisions included, among other things, revising the definition of consent. *See* Ryan Autullo, *Southwestern University*

4810-7095-1917, v. 5

*under another investigation for sexual assault*, AUSTIN AMERICAN-STATESMAN (March 16, 2017, 12:01 AM), https://www.statesman.com/NEWS/20170316/Southwestern-University-under-another-investigation-for-sexual-assault.

22.     On February 18, 2016, OCR launched a first investigation into Southwestern's handling of a sexual misconduct complaint, including whether Southwestern's response to the complaint was appropriate, timely, and fair. On March 13, 2017, the OCR initiated a second investigation into Southwestern regarding a separate sexual misconduct complaint. *See* Clara McMichael, *Southwestern University Title IX Investigation*, THE MEGAPHONE (April 18, 2017), https://megaphone.southwestern.edu/2017/04/18/southwestern-university-title-ix-investigation/.

23.     Three claims against Southwestern for Title IX violations remain pending with OCR. *See* Office for Civil Rights, *Pending Cases Currently Under Investigation at Elementary-Secondary and Post-Secondary Schools as of May 28, 2021 7:30AM*, U.S. DEPARTMENT OF EDUCATION (June 2, 2021), https://www2.ed.gov/about/offices/list/ocr/docs/investigations/open-investigations/tix.html?queries%5Bstate%5D=TX&page=4&offset=60.

24.     These public pressures, upon information and belief, have forced Southwestern to overreact to student allegations and impose harsh sanctions even where, as here, the allegations are unfounded, Southwestern lacked jurisdiction, the hearing was conducted in a manner materially and unfairly inconsistent with Southwestern procedure, and the sanctions are inappropriate.

25.     Consequently, Southwestern institutionalized unfair procedures that lead to wrongful punishments of students accused of misconduct.

4810-7095-1917, v. 5

## Southwestern's Title IX Process

26.     Southwestern has established a Student Sexual Misconduct Policy (the "Policy"). A copy of the Policy may be found at https://www.southwestern.edu/life-at-southwestern/title-ix/student-sexual-misconduct-policy/ and is attached hereto as Exhibit 1.

27.     In Section 1, the Policy notes "[t]he University has an obligation to investigate and resolve cases in which ***students*** feel they have been violated." *Id.* (emphasis added).

28.     In Section 2, the Policy states, "[t]he University may take disciplinary action in response to incidents that take place during official functions of the University, or those sponsored by registered student organizations, ***or incidents that have a substantial connection to the interests of Southwestern University*** regardless of the location in which they occur." *Id.* (emphasis added).

29.     The Policy provides adjudication options for students in Section 5 and contains no indication that it will have jurisdiction over third-party complaints. *Id.* at Section 5.

30.     Similarly, Title IX regulations provide "[a]t the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the recipient with which the formal complaint is filed." 34 CFR§ 106.30(a)

31.     The actual process that commences upon a complaint being filed is unclear. The Policy states only "[o]nce the University is notified of allegations of sexual misconduct, an inquiry (but not necessarily an investigation) must be initiated. If the inquiry identifies the Complainant, and the Complainant desires to proceed with a formal disciplinary complaint against the Respondent, a ***prompt, fair, and impartial*** investigation by the University will follow." *Id.* (emphasis added).

32.     The Policy contemplates that investigations should ordinarily be completed within sixty (60) days. *Id.* at Section 7.

33.     Sexual misconduct complaints are heard by a Sexual Misconduct Hearing Board (the "Hearing Board"). The Policy asserts that the potential members of the Hearing Board are faculty members who receive formal training on topics such as "referral sources for assistance, presentations on how Southwestern adjudicates sexual misconduct disciplinary cases, dynamics of acquaintance rape scenarios, variable survivor reactions, myths and facts about sexual misconduct that apply to both men and women, sensitivity to sexual orientation factors and appropriate standards of proof." *Id.* at Section 6.

34.     Three faculty members who have received such training ultimately sit on the Hearing Board. The parties are provided a list of potential Hearing Board members 48 hours prior to the hearing, to whom they can object up to 24 hours prior to the hearing, but the parties are not aware of the three members who will be sitting on the Hearing Board until the hearing itself. *Id.*

35.     The Dean of Students is also permitted to attend the hearing and is tasked with selecting the Hearing Board chair and presenting charges. *Id.* at Sections 6-7.

36.     Hearing procedures permit the Complainant and the Respondent to testify and respond to questions from the Hearing Board. *Id.* at Section 7.

37.     The Policy does not expressly permit cross-examination, despite that Title IX regulations mandate that parties be permitted to cross-examine each other. *See* 34 CFR § 106.45(b)(6)(i).

38.     Upon completion of testimony, questions, and closing statements, the Hearing Board deliberates. The Policy notes that "[a] preponderance of the evidence standard will

determine the violation, meaning that it is more likely than not that the Respondent committed the conduct violation." Exh. 1 at Section 7.

39.     Further, the Policy states that if a Respondent is found responsible, "both the Respondent and Complainant may make personal statements." *Id.*

40.     Following these personal statements and any statement of the Dean of Students regarding recommended sanctions, the Hearing Board informs the Respondent of his sanction and his right to appeal. *Id.*

41.     The Policy has no requirements as to the contents of the outcome and in fact does not even require a written outcome. The Policy does not address this fact even though Title IX regulations require universities to issue a written determination that includes specific items, including an identification of the allegations, a description of the university's procedural steps, findings of fact to support the determination, a description and rationale for the sanctions, and the appeal process. *See* 34 CFR § 106.45(b)(7)(ii)(A-F).

42.     The Respondent may appeal a finding of responsibility within three (3) business days of receiving written notice of the hearing results. Appeals are made to the Office of the Vice President for Student Life and may only be made on two grounds: (i) "the hearing was conducted in a manner materially and unfairly inconsistent with the established Hearing Board procedure"; and (ii) "information is available that was unavailable at the time of the hearing, and new information is relevant to the Hearing Board's determination." *See* Exh. 1 at Section 12.

43.     The Policy does not permit appeals on the grounds that the Title IX coordinator, investigators, or decision-makers had a conflict of interest or bias against a party, as required by Title IX regulations. *See* 34 CFR § 106.45(b)(8)(i)(C).

44.     The appeal is reviewed by an "Appellate Board," "composed of three (3) members of the Hearing Board pool who were not involved in the original hearing or intake process." The Policy does not demand disclosure of the Appellate Board members to the Respondent. Exh. 1 at Section 12.

45.     The Appellate Board is empowered to: (i) uphold the original decision and sanction; (ii) uphold the original decision and alter sanctions; (iii) refer the case to a rehearing; or (iv) refer the case back to the Hearing Board for review. *Id.*

46.     The Appellate Board makes its decision "based upon the written appeal and such other information as the Appellate Board deems at its discretion to be relevant." *Id.*

47.     The decision of the Appellate Board is final and is mailed to both parties within 13 business days of receipt of the appeal. *Id.*

48.     Similar to the hearing outcome, the Policy is silent on the necessary contents of the appeal outcome, even though Title IX regulations require that universities "[i]ssue a written decision describing the result of the appeal and the rationale for the result." 34 CFR § 106.45(b)(8)(iii)(E).

49.     The Appellate Board's decision is final. *See* Exh. 1 at Section 12.

**John is a Successful Student with a Promising Future**

50.     John is a 22-year old senior at Southwestern with just nine credits remaining prior to graduation.

51.     John is an excellent student, boasting a 3.5 GPA with a rigorous math major and business minor. Due to his credentials, John received the prestigious Finch Scholarship from Southwestern.

52.     John is also a highly talented member of the Southwestern Men's Golf team.

8

53.    Playing at the college level allows athletes to play in various tournaments, to attract sponsors for a post-college athletic career, and generally to make a name for themselves in the golf world.

54.    John plans to use his remaining athletic eligibility on his college team before pursuing a professional golfing career.

**Jane, a 38-Year Old Woman, Took Advantage of John, a Then-21-Year Old College Senior**

55.    John worked at Wingstop, a fast-food chain, for approximately five months between May and October of 2020 to earn extra income.

56.    While employed at Wingstop, John encountered Jane, a 38-year old woman who was also working at Wingstop.

57.    Jane is not, and has never been, a student or employee at Southwestern and, upon information and belief, is not, nor has she ever been, affiliated with Southwestern in any capacity.

58.    The two were cordial with each other as coworkers but did not socialize outside of their jobs.

59.    On November 8, 2020, after John had left Wingstop, he received a text from Jane asking to hang out.

60.    Having no other plans, John agreed and Jane took an Uber to his apartment, arriving at approximately 7:30 PM.

61.    Jane eventually said that she wanted to drink. Having no alcohol at his apartment, John agreed to drive Jane to a local H-E-B, a supermarket chain.

62.    Jane went inside to purchase alcohol while John stayed in the car. John did not ask Jane to purchase any alcohol for him, did not pay Jane for purchasing alcohol, and ultimately did not consume any alcohol that night.

4810-7095-1917, v. 5

63.     After returning to his apartment, Jane proceeded to drink the alcohol that she had purchased.

64.     John did not drink alcohol or knowingly ingest any drugs that evening.

65.     Later that evening, John suddenly felt ill.

66.     While John had informed Jane that she could not stay the night at his apartment, Jane claimed that it was too late for her to return home.

67.     At some point, John felt the need to go to sleep. Upon information and belief, Jane remained in the living room.

68.     John woke up the next morning alone in his bedroom around 8:00 AM. When John woke up, he was groggy, confused, and unsure of his surroundings.

69.     John returned to the living room, but Jane was in the second bedroom, which belonged to his out-of-town roommate.

70.     John had a class that morning at 11:00 AM and still needed to complete work prior to the class. He knocked on the second bedroom door and informed Jane that she needed to leave.

71.     Jane eventually exited the bedroom and said that she did not have money for an Uber. John called, and paid for, the Uber for Jane.

72.     When the Uber arrived, Jane informed John that she had a good time and left his apartment.

73.     Jane sent John several text messages later that day, in part reiterating that she had a good time. John responded twice and never texted her again after that.

74.     Jane continued to text John in the following days, but he did not respond to these messages.

4810-7095-1917, v. 5

75.     Jane's tone in the text messages was initially friendly, but became increasingly aggressive as John did not respond.

76.     A few days after the night in question, Jane texted John her location and asked him to meet her for drinks. After John did not respond, Jane suddenly shifted to claiming that John had sexually assaulted her while she was intoxicated and had given her a sexually transmitted infection ("STI").

77.     Jane's claims are entirely fabricated: not only was John incapable of physically taking advantage of Jane in any way given his condition that night, but John had tested negative for STIs.

78.     Rather, Jane only made her claims and sought retribution when John made clear that he was uninterested in having a relationship with her.

### John is the Subject of a Retaliatory Complaint

79.     On November 16, 2020, John received an email from Southwestern Dean of Students Shelley Story ("Dean Story").

80.     In part, Dean Story stated that she "received a report from ***a non-student*** alleging that [John] violated the University's sexual misconduct policy" (emphasis added).

81.     Later that day, Dean Story sent John a copy of the allegations that Jane made against him.

82.     Jane's claims are rife with untruths and inconsistencies. For example, she alleges that John "forced her to consume heavily large amounts of drinking alcohol while she was unconscious and heavily intoxicated with a blood alcohol level past 2.0," even as she later

4810-7095-1917, v. 5

acknowledges that she did not receive medical treatment to verify her blood alcohol concentration ("BAC") level.[2]

83.     Jane was also openly hostile and threatening towards John. In part, she stated that she "do[es]n't care if [Southwestern] ha[s] to expel him from campus and have him arrested" and noted that she has "male friends" who would "find him and kill him".

84.     John received a formal notice letter from Dean Story two days later on November 18, 2020. The notice letter stated that John is charged with violating the Policy's prohibition on sexual misconduct by interacting with an incapacitated person.

85.     The notice letter specifically stated that "[b]ecause Jane is **not a member of the SU community**, no interim measures are being imposed at this time." (emphasis added).

### A Grand Jury Refuses to Find Probable Cause

86.     Simultaneously with informing John of Southwestern's investigation, Dean Story also informed John that Jane's allegations would be relayed to the local police department.

87.     A detective from the Georgetown Police Department ("Georgetown PD") fully investigated Jane's allegations and met with her numerous times.

88.     John cooperated with the investigation and provided Georgetown PD with sufficient evidence to corroborate his account of the evening. This evidence included a negative December 2020 test result for the STI that Jane alleged she contracted from him, conclusively proving the falsity of Jane's claim.

---

[2] John notes that this claim of Jane's is false and objectively unbelievable on its face. A BAC level at .40% and above may cause coma or death. Nicolle Monico, *Blood Alcohol Level & Effects on the Body*, AMERICAN ADDICTIONCENTERS (November 5, 2020), https://www.alcohol.org/effects/blood-alcohol-concentration/. Further, the highest BAC *ever* recorded was a 1.48%, well below Jane's baseless claim of her BAC being "past 2.0". *See* David Farache, *What is the Lethal Blood Alcohol Level?*, RECOVERY BY THE SEA (May 20, 2019, 11:55 AM), https://rbsrehab.com/lethal-blood-alcohol-level/.

89.     Accordingly, Georgetown PD declined to issue a warrant for John's arrest and instead referred the case to the District Attorney's office to determine whether probable cause existed to support prosecuting John.

90.     "Probable cause" generally requires a set of facts and conditions sufficient to form a reasonable basis for a belief that a crime has been committed.

91.     A grand jury convened on March 16, 2021 and issued a "no bill," meaning that probable cause did not exist.

92.     Thus, even under the lowest legal standard of proof, the Texas criminal justice system declined to move forward with Jane's claims against John.

93.     John informed Dean Story of the "no bill."

### A Southwestern Hearing Board Finds John Responsible

94.     After charging John with a Policy violation in November 2020, Southwestern's investigation and hearing process proceeded extremely slowly.

95.     In fact, Dean Story informed John on December 18, 2020 that the process was "paused" because Southwestern could not get into contact with Jane.

96.     The process did not restart until January 29, 2021 when Jane finally responded to Southwestern. The practical effect of this delay was that these allegations and the threat of serious sanctions were hanging over John's head during Fall 2020 semester finals and throughout the Spring 2021 semester.

97.     John eventually met with Dean Story for an interview on April 1, 2021, during which he provided Dean Story with a written statement outlining his version of events. John also provided Dean Story with his negative test results of the STI that Jane alleges she contracted from him and the "no bill" result from the grand jury.

13

98.     The hearing was eventually scheduled to take place virtually on May 4, 2021, while John was in the midst of his final exams, and in fact occurred on that day.

99.     At the hearing, Jane made her opening statement, during which she spoke for over one hour on a range of topics that were not relevant to her allegations against John and had the potential to unfairly prejudice the Hearing Board against him.

100.     Following her statement, the Hearing Board posed numerous sympathetic questions to Jane, but failed to ask her about the clear issues with her narrative, including how John forced her to drink while she was unconscious, her alleged 2.0 BAC, and the STI that she could not have contracted from John.

101.     After a 15-minute recess, John provided his own statement, which in part highlighted the credibility and factual issues with Jane's story.

102.     The Hearing Board posed a series of aggressive questions to John which revealed they had predetermined his responsibility and held archaic beliefs about him as a male student. The Hearing Board asked John questions that they never asked Jane, including repeatedly asking why John wanted her to come over, why he allowed her to stay overnight, and why he did not force her to leave.

103.     Neither John nor his advisor were given the opportunity to cross-examine Jane.

104.     After questioning John, the Hearing Board met to deliberate before returning to announce that they had found John responsible for violating the Policy.

105.     John made a brief statement in which he expressed his hope that he would be able to complete his degree at Southwestern, after which the hearing ended.

106.     Upon information and belief, the hearing was audio recorded, although John has never received a copy of the audio recording.

107.    Dean Story emailed the hearing outcome on May 5, 2020. A copy of the hearing outcome letter (the "Hearing Outcome") is attached as Exhibit 2.

108.    The Hearing Outcome claimed that the preponderance of the evidence standard had been met, such that the Hearing Board found John responsible for violating the Policy. *Id.*

109.    The Hearing Outcome contains only three sentences of rationale, which criticizes John's recounting and claims that his "account failed to counter the evidentiary weight of [Jane's] narrative." *Id.* These statements entirely ignore John's illness that evening, the many issues with Jane's claims, and that a grand jury reviewed similar evidence and did not find that even probable cause, a much lower standard than the preponderance of the evidence, existed.

110.    The Hearing Board determined the appropriate sanction was expulsion, notwithstanding that John was just credits away from graduation.

### Southwestern Rejects John's Appeal without Rationale

111.    Per the Policy, John timely submitted his appeal within three business days on May 7, 2021 on the grounds that the hearing was conducted in a manner materially and unfairly inconsistent with the Policy, and that the sanction was inappropriate.

112.    In relevant part, John noted that the Hearing Board treated John differently during the hearing, including by asking him questions that they declined to ask Jane, that the Hearing Board failed to give any credence to the fact that John demonstrated her claim regarding STIs was false, and that a grand jury declined to find probable cause.

113.    The Appellate Board, the composition of which is still unknown to John, issued its decision on May 20, 2021. A copy of the appeal outcome letter (the "Appeal Outcome") is attached as Exhibit 3.

4810-7095-1917, v. 5

114.    The Appellate Board baselessly rejected John's appeal, stating only that they "reviewed all evidence and have come to the same conclusion of finding [John] responsible and [they] uphold the sanction of expulsion." *Id.*

115.    The Appeal Outcome thus concluded that John was expelled with no remaining options for appeal.

## IRREPARABLE HARM

116.    Southwestern followed a flawed process infected with gender bias as a result of the public pressures on it from the community and from Jane's inflammatory (and demonstrably false) statements throughout the process.

117.    This discriminatory tone lasted through the hearing and appeal process, as John was wrongfully found responsible even as the preponderance of the evidence standard was not, and could not be, met.

118.    The sanction of expulsion is excessive and unwarranted. John has only nine credits remaining to graduate and those credits can only be fulfilled at Southwestern.

119.    John's ability to play college golf has also been frustrated, as he enrolled at Southwestern for the express purpose of playing golf, participating in tournaments, and attracting sponsors.

120.    An expulsion on his record will severely and irreparably harm John's educational career. Further, the expulsion ensures that John's reputation is tarnished and his collegiate golfing career was cut short, causing severe harm to his economic prospects and future employment opportunities.

## CLAIM ONE
### Declaratory Judgment
### (Against Southwestern)

121.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

122.    An actual and justiciable controversy exists between John and Southwestern related to whether the University's policies and disciplinary process violate Title IX.

123.    The Court, pursuant to 28 U.S.C. § 2201(a) and Fed. R. Civ. P. 57, should declare that Southwestern's Title IX process is unlawful because it, *inter alia*: (i) allowed the University to investigate and adjudicate the complaint of a non-student against John, in violation of 34 CFR§ 106.30(a); (ii) permitted the University to override the grand jury's finding of no probable cause and claim that a higher burden of proof had been met; (iii) did not provide John with the opportunity to cross-examine Jane, in violation of 34 CFR § 106.45(b)(6)(i); (iv) did not permit John to appeal the Hearing Outcome on the grounds of conflict of interest or bias, in violation of 34 CFR § 106.45(b)(8)(i)(C); and (v) allowed the University to issue a Hearing Outcome and an Appeal Outcome devoid of substantive rationale and baselessly upholding the sanction of expulsion, in violation of 34 CFR § 106.45(b)(7)(ii) and 8(iii)(E).

124.    Such a declaration is proper, pursuant to U.S.C. § 2201(a), because it would terminate an "actual controversy" between the parties and declare John's rights with respect to these issues.

## CLAIM TWO
### Violation of Title IX
### (Against Southwestern)

125.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

4810-7095-1917, v. 5

126.    Title IX, 20 U.S.C. §§ 1681 et seq., provides, in relevant part, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

127.    Title IX is enforceable through an implied right of action affording an individual discriminated against due to his or her gender pecuniary damages and equitable relief.

128.    Southwestern is a recipient of federal funding.

129.    The conduct of Southwestern discriminated against John on the basis of his sex through a discriminatory, gender-biased implementation of the process, in the context of pressure from OCR and the Southwestern community.

130.    Southwestern proceeded with an investigation even though it lacked jurisdiction under Title IX and repeatedly admitted that Jane was a non-student.

131.    Southwestern credited Jane's version of events even though her account was uncredible and, at points, impossible.

132.    Southwestern ignored all evidence supporting John's version of events.

133.    Southwestern disregarded the fact that Georgetown Police Department declined to issue a warrant for John's arrest.

134.    Southwestern disregarded the fact that the grand jury issued a "no bill" on March 16, 2021 on identical facts and under a lower standard of proof.

135.    Instead, Southwestern was intent on finding John responsible even though the preponderance of the evidence standard was not, and could not, be met.

136.    Southwestern simply chose to believe Jane because she is a woman and to disbelieve John because he is a man.

137.     In adjudicating a complaint that it did not have jurisdiction over, and in wrongfully finding John to be responsible for a violation that he did not commit just because he was a man and the alleged victim was a woman, Southwestern reached an erroneous outcome, in violation of Title IX.

138.     In crediting Jane's version of events even though many of her claims were demonstrably and conclusively proven false, and wrongfully discrediting John's account, and cross-examining John about why he would socialize with Jane, Southwestern made archaic assumptions about John, in violation of Title IX.

139.     In adjudicating a claim made by a female non-student and bestowing favorable treatment on her throughout the process, while precluding John from asserting his rights and placing him at a disadvantage, Southwestern treated John differently due to his sex and engaged in selective enforcement, in violation of Title IX.

140.     Southwestern has failed to remediate its discriminatory actions against John and he is now at risk of irreparable harm to his reputation and to his future educational, economic, and professional prospects.

141.     As a direct and proximate result of Southwestern's actions and omissions, John has suffered and is entitled to compensatory damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

## **CLAIM THREE**
**Breach of Contract**
**(Against Southwestern)**

142.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

143.     John and Southwestern entered into a valid contract, which incorporated the Policy.

144.     Southwestern offered enrollment and a scholarship to John, and he accepted that offer and paid Southwestern remaining tuition.

145.     John satisfied all obligations required by Southwestern to remain in good standing and enrolled at Southwestern, with the understanding and reasonable expectation that Southwestern would fulfill its contractual obligations to him.

146.     Southwestern breached its contractual obligations to John by, *inter alia*: (i) adjudicating Jane's claim even though it lacked jurisdiction because Jane is not a student and the incident did not have a substantial connection to the interests of Southwestern; (ii) failing to conduct a prompt, fair, and impartial investigation, and instead prolonging the investigation for approximately six months; (iii) finding him responsible even though the preponderance of the evidence standard was not met; and (iv) denying John's appeal even as he met the requisite standard for appeal.

147.     As a direct and proximate result of Southwestern's actions and omissions, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

## **CLAIM FOUR**
### **Breach of Implied Covenant of Good Faith and Fair Dealing**
### **(Against Southwestern)**

148.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

149.     John and Southwestern had a contractual relationship that was earmarked by, *inter alia*, an imbalance of bargaining power and significant trust and confidence shared by the parties.

150.     Thus, John and Southwestern had a special and confidential relationship from which a duty of good faith and fair dealing arose on the part of Southwestern.

4810-7095-1917, v. 5

151.    John fulfilled all contractual obligations owed by him.

152.    Southwestern breached its duty of good faith and fair dealing as outlined herein, including by finding John responsible and denying his appeal, which could only have occurred in bad faith.

153.    As a direct and proximate result of Southwestern's actions and omissions, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

**CLAIM FIVE**
**Intentional Infliction of Emotional Distress**
**(Against Defendants)**

154.    John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

155.    In finding John responsible for sexual misconduct when all available evidence pointed to his innocence, Defendants intentionally inflicted severe emotional distress.

156.    Defendants acted intentionally or recklessly in finding John responsible where Jane's claims were demonstrably false, if not impossible, and she lacked any credibility.

157.    In finding John responsible and expelling him from school, even though he was just credits away from graduation and an expulsion will have devastating effects on his future, Defendants exhibited extreme and outrageous conduct.

158.    John's emotional distress was directly and proximately caused by Defendant's actions.

159.    As a result, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

### CLAIM SIX
**Negligence**
**(Against Southwestern)**

160.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

161.     Southwestern owed John a legal duty to ensure that John received a fair and impartial hearing process. Southwestern was on notice of Jane's false claims and could reasonably foresee that John could be wrongfully found to be responsible. Southwestern would not have been subject to a heavy burden to provide John with a fair process as promised to him in the Policy.

162.     Southwestern breached its duty to John when it permitted a discriminatory hearing process to occur, in violation of what the University was obligated to provide him.

163.     John sustained significant damages as a direct and proximate result of Southwestern's breach, including but not limited to his expulsion from the University.

164.     As a result, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

### CLAIM SEVEN
**Negligence**
**(Against Dean Story)**

165.     John restates and re-avers each and every allegation in the preceding paragraphs as if fully restated herein.

166.     Dean Story owed John a legal duty to act with reasonable care. Dean Story had knowledge of the falsity of Jane's claims, and her threats against John, and could reasonably foresee that John could be wrongfully found responsible or that Jane would take other action to harm John or his reputation.

4810-7095-1917, v. 5

167.    Dean Story breached this legal duty by overseeing a discriminatory process biased against John.

168.    John sustained significant damages as a direct and proximate result of Dean Story's breach, including but not limited to his expulsion from the University.

169.    As a result, John has suffered and is entitled to compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress that he has suffered, plus prejudgment interest, attorney fees, and costs.

**WHEREFORE**, John respectfully requests that this Court:

(A)    Issue a declaration that Southwestern's process is unlawful;

(B)    Award compensatory and punitive damages in an amount to be determined at trial, but that accounts for all emotional distress suffered by John;

(C)    Enter preliminary and permanent injunctive relief that vacates the decision of Southwestern to expel John, that reinstates to allow John to complete his degree, and permits John to play golf, that offers John the prorated portion of the Finch Scholarship to which he is entitled, and that removes from his academic record all references to the expulsion and any other related sanctions or disciplinary actions;

(D)    Award court costs and other reasonable expenses incurred in maintaining this action, including reasonable attorney fees; and

(E)    Award such other relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Plaintiff respectfully demands a trial by jury pursuant to Fed. R. Civ. P. 39.


*/s/ David Kenneth Sergi*


Dated: June 21, 2021

4810-7095-1917, v. 5

Respectfully Submitted,

*/s/ David Kenneth Sergi*
David Kenneth Sergi (No. 18036000)
Katherine Frank (No. 24105630)
Sergi and Associates P.C.
329 S. Guadalupe St.
San Marcos, TX 78666
P: (512) 759-8495
F: (512) 392-5042
E: david@sergilaw.com; katie@sergilaw.com
*Local Counsel for Plaintiff*

Susan C. Stone*
Kristina W. Supler*
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, OH 44114
P: (216) 696-8700
F: (216) 621-6536
E: scs@kjk.com; kws@kjk.com
*Pending Pro Hac Vice Admission*

*Counsel for Plaintiff John Doe*