## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| JOHN DOE, | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | CASE NO: 1:21-CV-541-RP |
| | § | |
| SOUTHWESTERN UNIVERSITY and | § | |
| SHELLEY STORY, | § | |
| | § | |
| *Defendants.* | § | |

### DEFENDANTS SOUTHWESTERN UNIVERSITY AND SHELLEY STORY'S
### MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(b)(6)

Defendants Southwestern University and Shelley Story move this Court to dismiss Plaintiff John Doe's Original Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) because Plaintiff has failed to state a claim against Defendants upon which relief may be granted.

### I.    Summary of Facts.

Southwestern University is a selective, private university located in Georgetown, Texas. Shelley Story is the University's Dean of Students. Since its inception in 1873, Southwestern has offered educational programs to students and, in turn, has required its students to adhere to a code of conduct as part of the privilege of being a member of the University community. While that student code of conduct has undoubtedly changed over the past approximately 150 years, there has never been a serious question about the University's right to set behavioral expectations and make conduct rules for its students which are reflective of the University's values. And there is a long history in Texas and elsewhere of the judiciary deferring to private universities' decisions regarding the setting of those institutional values and the discipline of their students.[1]

---

[1] *See, e.g.*, *Wood v. Strickland*, 420 U.S. 308, 326 (1975) ("It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion."); *see also Davis ex rel.*

As Plaintiff's Original Complaint and Jury Demand notes, one of Southwestern University's conduct rules for its students is memorialized in its Student Sexual Misconduct Policy (the "Policy").[2] It is worth pointing out that this Policy differs from the University's "separate 'Title IX Policy'"[3] which applies to incidents covered by recently promulgated Title IX regulations. The values undergirding the Policy are detailed in Exhibit 1 to the Complaint. The Policy makes plain the high standards Southwestern students are charged with upholding: "Southwestern University is a community of trust" which depends "upon strict adherence to standards of conduct by its members."[4] As is its right as a private institution, Southwestern declares that "any form of sexual misconduct" will not be tolerated.[5] It goes on to note: "The University takes all allegations of sexual misconduct seriously and will respond to **all complaints, reports, allegations and information about sexual misconduct**, of which it is aware."[6]

In clear language, the Policy applies to sexual misconduct that occurs, not only on campus, but also sexual misconduct that occurs off campus: "Southwestern University has the right to review and respond to on- and off-campus violations of the University's Student Sexual Misconduct Policy by students . . . ."[7] "**Anyone** may report a violation" of the Policy, and the "University may take disciplinary action in response to incidents that . . . have a **substantial connection to the interests of the University** regardless of the location in which they occur."[8] Finally, and notably, the Policy "applies to all students" and explicitly "**applies to third parties**."[9]

---

*LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648 (1999) ("[C]ourts should refrain from second-guessing the disciplinary decisions made by school administrators.").

[2]  Compl. ¶ 26.

[3]  Compl., Ex. 1 at 3.

[4]  Compl., Ex. 1 at 1.

[5]  *Id.*

[6]  Compl., Ex. 1 at 2 (emphasis added).

[7]  *Id.*

[8]  *Id.* (emphasis added).

[9]  *Id.* (emphasis added).

Here, third-party Jane Roe filed a report with Southwestern University that one of the University's students, Plaintiff, "sexually assaulted her while she was intoxicated" and "had given her a sexually transmitted infection . . . ."[10] While Plaintiff contends Southwestern should have done nothing with this report, unsurprisingly, Southwestern determined that this was an allegation of significant misconduct which had a "substantial connection to the interests of University" and implicated the Policy. Consequently, the University decided to utilize the process outlined in the Policy to determine whether Plaintiff engaged in sexual misconduct as reported by Jane Roe.[11]

That process is outlined in Sections 6 and 7 of the Policy. "Disciplinary complaints involving sexual misconduct are heard by the Sexual Misconduct Hearing Board ("Hearing Board")."[12] The Hearing Board consists of three trained faculty and staff members. The Dean of Students is charged with choosing "the chair of the Hearing Board" but does not play a part in rendering a decision about whether the Policy has been violated – that responsibility is left to the Hearing Board. Prior to convening, the Hearing Board is "provided with the charge(s), the Complainant's written complaint, the written reply of the Respondent (if any), attachments or list of witnesses, and any other documents or materials submitted by the parties or obtained during the investigation." In turn, the parties to the hearing are "informed of the names of the pool of potential Hearing Board members at least forty-eight hours prior to the hearing" and afforded the opportunity to challenge Board members.

Section 7 outlines the actual Hearing Board process. In sum, the process starts with the Dean of Students "presenting charges to the Hearing Board" and affording the Respondent the

---

[10] Compl. ¶ 76.
[11] Again, this Policy is distinct from the University's Title IX Policy which covers incidents covered by the 2020 Title IX Regulations. *See* Compl., Ex. 1 at 3 ("Under certain circumstances and with some conditions, violations of this policy will qualify as 'Sexual Harassment' as defined by implementing regulations for Title IX of the Education Amendments of 1972 (see 34 C.F.R. § 106 et seq.). Those violations will be addressed under the separate 'Title IX Policy.' All other violations will be addressed under this policy.") This issue is discussed in more detail below.
[12] Compl., Ex. 1 at 8.

opportunity to either contest or accept responsibility. If responsibility for the charges is contested, the hearing commences with the parties and witnesses presenting live testimony. The Hearing Board is afforded the opportunity to question parties and witnesses. "Should the Respondent or the Complainant have a question of a witness, or of each other, that question must be provided at the conclusion of the witness's statement and must be presented in writing to the chair, who will determine whether to ask the question of the witness, based on relevance or other factors at the chair's discretion." The parties are also afforded the "opportunity to make a brief statement to the Hearing Board concerning the evidence or the issues for the Hearing Board to consider." "Upon completion of the closing statements by the Complainant and the Respondent, the Hearing Board will commence deliberation of responsible or not responsible in closed session. Only Hearing Board members are present in the closed session during deliberation."[13] The University's Hearing Board is tasked with determining whether a preponderance of evidence supports a finding that a Respondent violated the Policy.

In this instance, Plaintiff's Complaint tacitly acknowledges that Defendants complied with this process in ultimately finding Plaintiff responsible for violating the University's Sexual Misconduct Policy.[14] The University's process for Appeals is discussed in Section 12 of the Policy. Again, Plaintiff's Complaint tacitly acknowledges that Defendants complied with this appellate process in ultimately upholding the Hearing Board's determination that Plaintiff violated the Policy.[15] Instead, Plaintiff argues that the process outlined in the Policy was deficient because it failed to comply with recently enacted Title IX regulations which, as detailed below, clearly did not apply to this situation.[16]

---

[13] Compl., Ex. 1 at 9.
[14] *See, e.g.*, Compl. ¶¶ 98–104;  Compl., Ex. 2.
[15] Compl. ¶¶ 111–115.
[16] *See, e.g.*, Compl. ¶¶ 43, 103, 123.

In conclusory fashion, Plaintiff also contends that he was only found responsible because he is a male in violation of Title IX, and not because he was "unable to frame a substantial, detailed or credible account of the events of the evening of November 8th, 2020" and "failed to counter the evidentiary weight of [Jane Roe's] narrative."[17] For the reasons discussed in detail below, his evidence of purported sex discrimination is deficient as a matter of law. In conclusory fashion, he also simply invites this Court to second-guess the University's determination that Plaintiff violated its Sexual Misconduct Policy, arguing, for instance, that Jane's claims are "rife with untruths and inconsistencies"[18] and suggesting that the University was somehow bound to follow a grand jury's finding of no probable cause[19] despite the fact that the Policy explicitly provides that "[a]n action involving a student in a legal proceeding in civil or criminal court does not affect the University's ability to pursue its own internal disciplinary proceedings."

Boiled down to essentials, all Plaintiff is inviting this Court to do is second guess the decision of various Southwestern employees that Plaintiff violated one of Southwestern's conduct rules. It is an invitation this Court should and must decline.

## II.   Argument.

### A.   Standard of Review.

Federal Rule of Civil Procedure 12(b)(6) allows dismissal of a pleading which, on its face (and together with any exhibits), fails to state a claim on which relief can be granted. Dismissal under Rule 12(b)(6) may be based on either a lack of a cognizable legal theory or the absence of sufficient facts alleged to support a legal theory. *See UTex Commc'ns Corp. v. Pub. Util. Comm'n of Tex.*, 514 F. Supp. 2d 963, 968 (W.D. Tex. 2007).

---

[17] Compl., Ex. 2.
[18] Compl. ¶ 82.
[19] Compl. ¶ 123.

To withstand a Rule 12(b)(6) motion, a pleading must contain sufficient factual matter "to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations omitted). A pleading must include more than mere labels and conclusions. *Id*. ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw reasonable inferences that the defendant is liable for the misconduct alleged."). The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully." *Id*. Where a complaint pleads facts that are "merely consistent with a defendant's liability," it stops short of meeting the facial plausibility standard. *Id*.

A claim for relief is implausible on its face when "the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Id*. at 679. The court must accept the well-pleaded allegations in the complaint as true; however, [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* The complaint must include "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and the Supreme Court has rejected "naked assertions devoid of further factual enhancement" to satisfy Rule 8's pleading requirements. *Id.* at 678 (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

## B. Plaintiff has Failed to Plead a Viable Title IX Claim.

Title IX is a straightforward piece of legislation which prohibits intentional sex discrimination in education programs and activities that receive federal financial assistance.[20] The law's text does not contain an explicit right of action; however, the Supreme Court held over 40 years ago that it is "enforceable through an implied private right of action." *Cannon v. Univ. of Chi.*, 441 U.S. 677, 690–93 (1979). As the Supreme Court also made plain, though, Title IX is not

---

[20] 20 U.S.C. § 1681(a). Southwestern acknowledges that it receives federal funding and is covered by Title IX.

a vehicle for courts to merely "second-guess the disciplinary decisions made by school administrators." *Davis ex rel. LaShonda D. v. Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 648, (1999). "It is not the role of the federal courts to set aside decisions of school administrators which the court may view as lacking in wisdom or compassion." *Plummer v. Univ. of Hous.*, 860 F.3d 767, 772 (5th Cir. 2017) (quoting *Wood v. Strickland*, 420 U.S. 308, 326 (1975)).

Here, Plaintiff makes two arguments regarding Title IX – both of which are baseless. First, Plaintiff argues that this Court:

> should declare that Southwestern's Title IX process is unlawful because it, *inter alia*: (i) allowed the University to investigate and adjudicate the complaint of a non-student against John, in violation of 34 CFR§ 106.30(a); (ii) permitted the University to override the grand jury's finding of no probable cause and claim that a higher burden of proof had been met; (iii) did not provide John with the opportunity to cross-examine Jane, in violation of 34 CFR § 106.45(b)(6)(i); (iv) did not permit John to appeal the Hearing Outcome on the grounds of conflict of interest or bias, in violation of 34 CFR § 106.45(b)(8)(i)(C); and (v) allowed the University to issue a Hearing Outcome and an Appeal Outcome devoid of substantive rationale and baselessly upholding the sanction of expulsion, in violation of 34 CFR § 106.45(b)(7)(ii) and 8(iii)(E).[21]

Put in simpler terms, Plaintiff first argues that: (a) the underlying student conduct charge brought against him was not consistent with 2020 Title IX regulations promulgated under the Trump Administration; and (b) the failure to comply with those regulations creates a cause of action. For the reasons discussed below, these positions are wrong.

His second argument is that he is a victim of sex discrimination and that Southwestern violated Title IX because the University employed a "discriminatory, gender-biased implementation of the process, in the context of pressure from [the Department of Education's Office for Civil Rights ("OCR")] and the Southwestern community."[22] For the reasons discussed

---

[21] Compl. ¶ 123.
[22] Compl. ¶ 129.

below, this argument is factually baseless and applicable precedent makes plain that Plaintiff has failed to adequately plead discrimination on the basis of sex.

    *1.*    *The Trump Administration Title IX Regulations Did Not Govern the Incident Between Plaintiff and Jane Roe.*

Plaintiff's iteration of the recent history of Title IX regulatory enforcement skips significant developments which occurred immediately prior to Jane Roe's report to the University. For instance, Plaintiff notes that, "On April 11, 2011, [OCR] issued its now infamous 'Dear Colleague Letter,' which instructed universities on how to investigate and resolve complaints of sexual misconduct under Title IX. . . ."[23] Whether the Obama Administration's 2011 Dear Colleague Letter ("DCL") was "infamous" is perhaps an interesting coffeehouse conversation; however, when Jane Roe's report of sex assault was received by Southwestern University, the Trump Administration had specifically withdrawn the "infamous" 2011 Dear Colleague Letter on September 22, 2017.[24] It also included the promulgation of comprehensive Title IX regulations.[25]

Plaintiff makes reference to those regulations throughout his Complaint and argues that "Southwestern's Title IX process" should be declared unlawful because it failed to comply with various portions of those Title IX regulations.[26] In self-contradiction, Plaintiff also argues, "Southwestern proceeded with an investigation even though it lacked jurisdiction under Title IX and repeatedly admitted that Jane was a non-student."[27] Regardless of whether Plaintiff is confused or deliberately trying to obfuscate, reality is straightforward: the Title IX "grievance process for

---

[23] Compl. ¶ 17.
[24] *See I.F. v. Lewisville Indep. Sch. Dist.*, 915 F.3d 360, 375 n.14 (5th Cir. 2019) ("The U.S. Department of Education's Office for Civil Rights has since rescinded the Dear Colleague Letter. Dear Colleague Letter, Candice Jackson, Acting Assistant Sec'y for Civil Rights, Office for Civil Rights, U.S. Dep't of Educ. (Sept. 22, 2017), https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-ix-201709.pdf.").
[25] *See* Final Rule, 85 Fed. Reg. 30,026 (May 19, 2020) (codified at 34 C.F.R. pt. 106).
[26] Compl. ¶ 123.
[27] Compl. ¶ 130.

formal complaints of sexual harassment" regulations[28] (*i.e.*, the regulatory requirements cited throughout Plaintiff's Complaint) apply only to incidents of alleged "sexual harassment"[29] which are the subject of a "formal complaint"[30] and which take place within an institution's "education program or activity."[31] In this instance, at a minimum, it is undisputed that Jane Roe was not a student (or attempting to participate in a Southwestern education program or activity) and could not file a "formal complaint" as defined by the regulations.[32] Consequently, the Title IX "grievance process for formal complaints of sexual harassment" regulations did not apply to Plaintiff's disciplinary process.[33]

Plaintiff's argument that Southwestern was not entitled to "proceed with an investigation" against Plaintiff because "Jane was a non-student" and/or because the alleged assault took place outside of Southwestern's educational program or activities is equally unavailing and specifically rejected by those same Title IX regulations. *See* 34 C.F.R. § 106.45(b)(3)(i).

To the extent there is any ambiguity about the meaning of 34 C.F.R. § 106.45(b)(3)(i) and/or the scope of the regulations, the Preamble to the Title IX regulations clears it up:

> The § 106.45 grievance process obligates recipients to investigate and adjudicate allegations of sexual harassment for Title IX purposes; **the Department does not have authority to require recipients to investigate and adjudicate misconduct that is not covered under Title IX, nor to preclude a recipient from handling misconduct that does not implicate Title IX in the manner the recipient deems fit. . .** The criticism of many commenters was well-taken as to the lack of clarity in the proposed rules regarding a recipient's discretion to address allegations subject

---

[28] 34 C.F.R. § 106.45.

[29] 34 C.F.R. § 106.30 (a).

[30] 34 C.F.R. § 106.30 notes that "At the time of filing a formal complaint, a complainant must be participating in or attempting to participate in the education program or activity of the [University] with which the formal complaint is filed." See also  Compl. ¶ 30.

[31] "Education program or activity" includes locations, events, or circumstances over which the recipient exercised substantial control over both the respondent and the context in which the sexual harassment occurs, and also includes any building owned or controlled by a student organization that is officially recognized by a postsecondary institution. 34 C.F.R. § 106.44.

[32] Compl. ¶ 30.

[33] As noted above, Southwestern has a separate "Title IX Policy" which applies to situations covered by the Title IX regulations. *See*  Compl., Ex. 1 at 3.

to the mandatory dismissal through non-Title IX code of conduct processes. **The final regulations therefore revise § 106.45(b)(3)(i) to expressly state . . . that "the recipient must dismiss the formal complaint with regard to that conduct for purposes of sexual harassment under title IX or this part; such a dismissal does not preclude action under another provision of the recipient's code of conduct." The Department notes that recipients retain the flexibility to employ supportive measures in response to allegations of conduct that does not fall under Title IX's purview, as well as to investigate such conduct under the recipient's own code of conduct at the recipient's discretion. This clarifies that the Department does not intend to dictate how a recipient responds with respect to conduct that does not meet the conditions specified in § 106.44(a).** For similar reasons, the Department does not believe that it has the authority to make dismissal optional by changing "must dismiss" to "may dismiss" because that change would imply that if a recipient chose not to dismiss allegations about conduct that does not meet the conditions specified in § 106.44(a), the Department would nonetheless hold the recipient accountable for following the prescribed grievance process, but **the § 106.45 grievance process is only required for conduct that falls under Title IX.** The Department therefore retains the mandatory dismissal language in this provision and adds the clarifying language described above. **Thus, these final regulations leave recipients discretion to address allegations of misconduct that do not trigger a recipient's Title IX response obligations due to not meeting the Section 106.30 definition of sexual harassment, not occurring in the recipient's education program or activity, or not occurring against a person in the U.S.**[34]

Put simply, the Title IX regulations Plaintiff claims Southwestern failed to follow (a) did not apply to this situation, and (b) did not bar Southwestern from using the Policy to address misconduct not covered by the regulations.[35]

2.    *Plaintiff Has Failed to Adequately Plead Discrimination on the Basis of Sex.*

Plaintiff contends that Southwestern engaged in sex discrimination against him in violation of Title IX because it (a) utilized a "discriminatory, gender-biased implementation of the process" (b) "in the context of pressure from OCR and the Southwestern community."[36] As discussed

---

[34] Final Rule, 85 Fed. Reg. 30288–89 (May 19, 2020).

[35] Even assuming *arguendo* the Title IX regulations did apply to this situation (and they did not), they provide an administrative enforcement standard for the Department of Education and there is no indication that the regulations are designed to create an independent cause of action.

[36] Compl. ¶ 129.

below, these are precisely the sorts of conclusory assertions of purported sex bias that courts have routinely rejected.

Title IX's private right of action is specifically intended to enforce a prohibition on "intentional sex discrimination." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005). Claims challenging a university disciplinary proceeding on grounds of sex-based bias generally fall within two categories: "erroneous outcome" and "selective enforcement." *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019) (*quoting Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994)). In this matter, Plaintiff appears to be proceeding exclusively with an "erroneous outcome" claim. Under the "erroneous outcome" theory, a plaintiff must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding"[37] and (2) "particular circumstances suggesting that gender bias was a motivating factor behind the erroneous finding." *Yusuf*, 35 F.3d at 715. Again, because a Title IX claim must be tied to intentional discrimination "on the basis of sex," Plaintiff must demonstrate a "causal connection between the flawed outcome and gender bias." *Klocke v. Univ. of Tex. at Arlington*, 938 F.3d 204, 210 (5th Cir. 2019). To satisfy this element, a plaintiff must do more than merely rely on "a conclusory allegation of gender discrimination . . . ." *Yusuf*, 35 F.3d at 715. Sufficiently particularized allegations of gender discrimination "might include, *inter alia*, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Id.*; *Marymount Univ.*, 297 F. Supp. 3d at 586 ("Stated differently, a Title IX plaintiff successfully alleges gender bias if

---

[37] "The first element [of the erroneous outcome inquiry] can be satisfied by (1) pointing to procedural flaws in the investigatory and adjudicative process, (2) identifying inconsistencies or errors in the findings, or (3) challenging the overall sufficiency and reliability of the evidence." *Doe 2 by & through Doe 1 v. Fairfax Cty. Sch. Bd.*, 384 F. Supp. 3d 598, 607 (E.D. Va. 2019), *aff'd*, 832 F. App'x 802 (4th Cir. 2020). "The pleading burden as to the first element – articulable doubt – is 'not heavy' and can normally be met by alleging 'particular procedural flaws affecting the proof.'" *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d 646, 679 (M.D. Tenn. 2018) (*quoting Yusuf*, 35 F.3d at 715).

he or she points to statistical evidence of gender bias in the University's decision making, policies and procedures that are designed to reach gender-specific outcomes, and/or statements by university officials evidencing gender bias.").

In this case, Plaintiff has failed to identify in his Complaint any procedural flaws in the investigatory and adjudicative process or inconsistencies or errors in the Hearing Board's findings. For that reason alone, his erroneous outcome claim must be dismissed.

Even assuming *arguendo* that Plaintiff has adequately pleaded that Defendant reached the wrong result, he has failed entirely to demonstrate that he was found responsible **because of his sex**. On that score, while repeating a conclusory assertion that Southwestern utilized a "discriminatory, gender-biased implementation of the process," Plaintiff's Complaint is devoid of any specific facts suggesting that the process was "discriminatory" or "gender-biased" or that any of the various employees who participated in the process were "discriminatory" or "gender-biased." *See generally, Doe v. Columbia Coll. Chi.*, 933 F.3d 849, 854–55 (7th Cir. 2019) ("A plaintiff cannot rely on [] generalized allegations [of anti-male bias] alone, . . . but must combine them with facts particular to his case to survive a motion to dismiss.").

As noted above, in assessing the report made against Plaintiff, Southwestern followed the process as outlined in the Policy. There is nothing on the face of the Policy or that process that is inherently discriminatory. Additionally, the rationale for the Hearing Board's decision shows absolutely no sign of discrimination against Plaintiff because he is a male. Instead, the Hearing Board notes that Plaintiff "was unable to frame a substantial, detailed or credible account of the events of the evening of November 8th, 2020." In evaluating a "he-said/she-said" case like the one faced by the Hearing Board, it is common for decisionmakers to assess the quality of each party's statement in assessing who may be more credible. That is precisely what the Hearing Board did

here, and there is nothing inherently discriminatory about this. Additionally, as Plaintiff acknowledges, both Jane Roe and Plaintiff were afforded identical opportunities to provide statements. While Plaintiff, in conclusory fashion, asserts the Hearing Board members posed "sympathetic questions to Jane" and "aggressive questions to John,"[38] there is certainly no assertion that any of the faculty and staff employees on the Hearing Board made any sort of discriminatory comments throughout the Hearing or otherwise had any history of discriminating against males. *See Sahm v. Miami Univ.*, 110 F. Supp. 3d 774, 778–80 (S.D. Ohio 2015) (dismissing plaintiff's Title IX claim because the complaint failed to allege any statements of members of the disciplinary body or university officials or any patterns of conduct that permitted the court to infer bias against male students). While Plaintiff is correct that "[n]either John nor his advisor were given the opportunity to cross-examine Jane," Jane Roe was also not provided an opportunity to directly cross-examine Plaintiff if for no other reason than the Policy did not allow for cross-examination. Rather, the Policy afforded both Plaintiff and Jane Roe the ability to question each other through the Hearing Panel Chair.

In the absence of any actual allegations of sex discrimination against Plaintiff, Plaintiff argues that the Obama Administration's 2011 Dear Colleague Letter coupled with "threats of federal investigations, sanctions, and lawsuits" prompted the Hearing Board members to discriminate against Plaintiff as a means of avoiding such federal investigations and lawsuits.[39] That such an argument is advanced while Plaintiff brings a lawsuit against the University should not be lost on this Court, *i.e.*, to the extent student disciplinary matters are influenced by threats of litigation or investigation by OCR, **the only person in this matter between Jane Roe and Plaintiff who could sue the University or file an OCR complaint against the University was**

---

[38] No specific examples are provided.
[39] Compl. ¶ 18.

**Plaintiff**. Along these same lines, while such an argument regarding OCR regulatory pressure may have been in vogue over five years ago, Plaintiff completely ignores the fact that the Trump Administration made protecting the rights of accused students its Title IX compliance priority. This was reflected by their decision to rescind the 2011 Dear Colleague Letter on September 22, 2017 and promulgate the 2020 Title IX regulations. Again, to the extent student disciplinary matters in general are influenced by the threat of investigation from the Department of Education, Jane Roe's report was made during the Trump Administration (which was focused on the rights of accused students) and the only person who could have lodged a complaint with OCR was **Plaintiff**. In any event, Plaintiff makes no claim that the actual faculty and staff members who comprised Plaintiff's Hearing Board knew anything about any of this regulatory or litigation backdrop and/or were in any way influenced by potential institutional liability concerns when rendering their decision.

Similarly, Plaintiff cites the fact that Southwestern "students engaged in a series of protests **in 2015** following the University's response to claims of sexual misconduct arising from a fraternity event," and, like hundreds of institutions of higher education, Southwestern was subject to OCR investigations in 2016 and 2017 as evidence that the Hearing Board members were inclined to discriminate against him because he was male. This assertion is absurd. Again, the protests were over six years ago and Plaintiff has failed to connect any of the Hearing Panel members to this protest or allege that any of the Hearing Panel members knew about the protest or OCR investigations, much less that they were compelled to reach the finding they reached to mollify protestors (who likely would have graduated from Southwestern) or OCR (which undoubtedly would have no interest in a claim brought by someone who was not a participant in the University's educational program).

Courts across the country have dismissed comparable Title IX claims asserting only speculative and conclusory allegations of sex discrimination in student disciplinary proceedings. *See, e.g.*, *Doe v. Univ. of St. Thomas*, 240 F. Supp. 3d 984, 990–93 (D. Minn. 2017) (collecting cases dismissing Title IX claims). Again, Plaintiff offers no statements by any of the relevant decisionmakers exhibiting anti-male bias or any other evidence of bias. *See Yusuf*, 35 F.3d at 715; *see also Atria v. Vanderbilt*, 142 F. App'x 246, 256 (6th Cir. 2005) (noting that in "the university setting, a disciplinary committee is entitled to a presumption of honesty and integrity, absent a showing of actual bias"); *Nash v. Auburn Univ.*, 812 F.2d 655, 665 (11th Cir. 1987) ("Any alleged prejudice on the part of the board must be evident from the record and cannot be based in speculation or inference."); *Ikpeazu v. Univ. of Neb.*, 775 F.2d 250, 254 (8th Cir. 1985) ("[W]e observe that the committee members are entitled to a presumption of honesty and integrity unless actual bias, such as personal animosity, illegal prejudice, or a personal or financial stake in the outcome can be proven."). He has also failed to identify any statistics, patterns, or anecdotal evidence tending to show gender bias in the investigation, hearing, or sanctions under the Policy. *Doe v. Trs. of Boston Coll.*, 892 F.3d 67, 84 (1st Cir. 2018) ("[A]lleged prejudice of university hearing bodies must be based on more than mere speculation and tenuous inferences."). For all of these reasons, his Title IX claims should be dismissed.

### C.      Plaintiff Has Failed to Plead a Viable Breach of Contract Claim.

Plaintiff appears to be claiming that the Policy created a valid contract between him and Southwestern and that Southwestern breached that contract.[40] Under Texas law, a plaintiff asserting a breach-of-contract claim must prove: (1) the existence of a valid contract; (2) that the plaintiff performed or tendered performance; (3) that the defendant breached the contract; and (4)

---

[40] Compl. ¶ 146.

that the plaintiff was damaged as a result of the breach. *Southwell v. Univ. of Incarnate Word*, 974 S.W.2d 351, 354–55 (Tex. App.—San Antonio 1998, pet. denied); *USAA Texas Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 501 n.21 (Tex. 2018).

Again, Plaintiff appears to allege that the Policy created a contract between Plaintiff and Southwestern. Defendant is not aware of any Texas case holding that the promulgation of a solitary university policy, as opposed to comprehensive student bulletins or handbooks, creates a contract. Even assuming the Policy did create a contract between Plaintiff and Southwestern, though, Southwestern followed the Policy and there is no breach. To that end, Plaintiff cites four ways in which the Policy was purportedly violated. Each is discussed below.

1. *Southwestern adjudicated "Jane's claim even though it lacked jurisdiction because Jane is not a student and the incident did not have a substantial connection to the interests of Southwestern."*

As Exhibit 1 to the Complaint makes plain, though, "Anyone may report a violation" of the Policy, and the Policy explicitly "applies to third parties."[41] Additionally, the University specifically reserves the right to "take disciplinary action in response to incidents that . . . have a substantial connection to the interests of Southwestern University . . . ."[42] Here, given the gravity of the allegations levelled against Plaintiff, the University's decision that the report had a substantial connection to the interests of the University is obvious and reasonable.

2. *Southwestern failed "to conduct a prompt, fair, and impartial investigation, and instead prolonging the investigation for approximately six months."*

There is no factual support in the Complaint supporting the conclusory assertion that the investigation was unfair or partial. Rather, there is mention in the Complaint of delays in the investigation. To that end, though, the Policy is clear: "Southwestern University seeks to complete

---

[41] Compl., Ex. 1 at 3.
[42] *Id.*

the investigation of all reports of sexual misconduct within sixty (60) days. That time frame is meant to be a guideline rather than rigid requirement. Circumstances may arise that require the extension of time frames, including extension beyond sixty (60) days. Such circumstances may include . . . the complexity of the allegations . . . the availability of the parties or witnesses, the effect of a concurrent criminal investigation, or other unforeseen circumstances."[43]

3.     *Southwestern found Plaintiff "responsible even though the preponderance of the evidence standard was not met."*

Plaintiff's conclusory assertion that the Policy contractually compelled the Hearing Board to find him not responsible is absurd. It was the Hearing Board's responsibility pursuant to the Policy to determine whether a preponderance of the evidence existed. That they reached a decision Plaintiff disagrees with is no basis for a breach of contract claim.

4.     *Southwestern denied Plaintiff's "appeal even as he met the requisite standard for appeal."*

Again, Plaintiff's conclusory assertion that the Policy contractually obligated the Appellate Board to reverse the finding of not responsible is absurd. The Appellate Board considered and rejected Plaintiff's appeal. While Plaintiff understandably disagrees with this decision, that fails to provide a basis to assert a breach of contract claim.

**D.    Texas Law Does Not Impose a Duty of Good Faith and Fair Dealing in this Context.**

Plaintiff asserts a claim against Southwestern for breach of the implied covenant of good faith and fair dealing.[44] This claim is easily disposed of as it is precluded by binding Fifth Circuit precedent. *See Hux v. Southern Methodist University*, 819 F. 3d 776 (5th Cir. 2016) ("Texas law does not impose a duty of good faith and fair dealing in the student-university relationship . . . .").

---

[43] Compl., Ex. 1 at 11.
[44] Compl. ¶¶ 148–153.

**E.      Plaintiff has Failed to Plead the Requisite Elements of an Intentional Infliction Claim.**

Under Texas law, intentional infliction of emotional distress ("IIED") has four elements: (1) the defendant acted intentionally or recklessly; (2) the conduct was extreme and outrageous; (3) the defendant's actions caused the plaintiff emotional distress; and (4) the emotional distress suffered by the plaintiff was severe. *Mattix Hill v. Reck*, 923 S.W.2d 596, 597 (Tex. 1996) (citing *Twyman v. Twyman*, 855 S.W.2d 619, 621 (Tex. 1993)). The defendant's conduct must have been "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." *Twyman*, 855 S.W.2d at 621; *Hirras v. Nat'l R.R. Passenger Corp.*, 95 F.3d 396, 400 (5th Cir. 1996).

Still, not all extreme and outrageous conduct is actionable under intentional infliction of emotional distress—"the plaintiff must also demonstrate that there is ***no alternative cause of action available*** to address the alleged misconduct." *Stelly v. Duriso*, 982 F.3d 403, 408 (5th Cir. 2020) (citing *Hoffmann-La Roche, Inc. v. Zeltwanger*, 144 S.W.3d 438, 447 (Tex. 2004)) (emphasis added). That is because IIED is a "gap-filler" tort that was "judicially created for the limited purpose of allowing recovery in those rare instances in which a defendant intentionally inflicts severe emotional distress in a manner so unusual that the victim has no other recognized theory of redress." *Standard Fruit and Vegetable Co. v. Johnson*, 985 S.W.2d 62, 68 (Tex. 1998); *Zeltwanger*, 144 S.W.3d at 447. This cause of action is "never intended to supplant or duplicate existing statutory or common-law remedies." *Toronka v. Cont'l Airlines, Inc.*, 649 F. Supp. 2d 608, 612–13 (S.D. Tex. 2009) (internal citations and quotation marks omitted).

Here, Plaintiff bases his claim for intentional infliction of emotional distress on the same underlying conduct and facts as the other claims under which he seeks to recover, and any potential

IIED claim would overlap with Plaintiff's Title IX, breach of contract, and negligence claims. Plaintiff did not allege any additional facts in support of his IIED claim. Thus, Plaintiff cannot sufficiently plead a claim for intentional infliction of emotional distress.

Even if the IIED claim is not preempted by Plaintiff's other claims, Southwestern's conduct in no way rises to the level of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress. By way of comparison, in *Schwager v. Telecheck Services, Inc.*, the Court affirmed the dismissal of an employee's infliction of emotional distress against her supervisor. 14-01-00099-CV, 2002 WL 31995012 at *8 (Tex. App.—Houston [14th Dist.] Dec. 19, 2002, no pet.). There, the Court found evidence in the record that the supervisor had screamed at the employee on a frequent basis, humiliated her in front of her colleagues, used vulgar language to which the employee had objected, and, using obscenities, threatened to fire the employee. *Id.* at *7. The Court reasoned that while the supervisor's conduct was "unquestionably objectionable, [it did not] rise to the level of extreme and outrageous conduct necessary to support a claim for intentional infliction of emotional distress." If the conduct in *Schwager* is insufficient to support a claim for intentional infliction of emotional distress, then so too is the alleged conduct by Southwestern.

Plaintiff has also not alleged that he has suffered severe emotional distress. Even liberally construed, the most Plaintiff alleges is that Plaintiff being expelled from school "will have devastating effects on his future."[45] Plaintiff has not pleaded emotional distress that would "rise to a level that no reasonable person could be expected to endure it without undergoing unreasonable suffering." *Vaughn v. Drennon*, 372 S.W.3d 726, 733 (Tex. App.—Tyler 2012, no pet.) (citing *GTE Sw., Inc. v. Bruce*, 998 S.W.2d 605, 618 (Tex. 1999)).

---

[45] Compl. ¶ 157.

For example, in *Vaughn*, plaintiffs brought an intentional infliction of emotional distress claim against a neighboring landowner after he:

> force[d] the flow of water off his property and onto the [plaintiffs'] property, contributing to the death of the [plaintiffs'] grapevine, soiling their laundry as it hung out to dry, pollut[ed] the air with vehicle fumes near where [plaintiff] worked in her yard, install[ed] lights to illuminate the [plaintiffs'] backyard and shine inside their home, carr[ied] a handgun, [] constantly videotap[ed] them . . . threaten[ed] to shoot them as they stood on the [plaintiffs'] property and . . . [got] a gun out of his truck and point[ed] it at them.

*Vaughn*, 32 S.W.3d at 732. Because of this conduct, the plaintiff testified that she suffered emotional distress as follows:

> She no longer goes out when [defendant] is around and does not go out in her yard by herself anymore, . . . the gun threat scared her to death, the lights [defendant] put up keep her awake, the stress affects her sleep, her "well being" has decreased greatly, and she is not able "to be around people" the way she used to . . . [s]he is worried about their finances because they live on a fixed income and they have been out a considerable amount of money because of this situation, . . . she worries about [her husband's] stress because he has a heart condition and she fears for [her husband's] personal safety.

*Id.* at 733. Despite this, the court found that plaintiffs did not suffer severe emotional distress as a result of defendant's conduct. *Id.* at 734.

Here, Plaintiff has not pleaded that he has suffered emotional distress at all, much less distress that would rise to the level of severity required under Texas law to state a claim for intentional infliction of emotional distress. Accordingly, Plaintiff's IIED claim should be dismissed.

### F.    Plaintiff's Negligence Claims Against Dean Story and Southwestern are Baseless.

Finally, Plaintiff's Complaint also alleges that Southwestern owed a legal duty to Plaintiff "to ensure that John received a fair and impartial hearing process."[46] Plaintiff claims Southwestern

---

[46] Compl. ¶ 161.

breached this duty "when it permitted a discriminatory hearing process to occur, in violation of what the University was obligated to provide him."[47] Further, Plaintiff's Complaint alleges that Dean Story owed a duty to Plaintiff "to act with reasonable care" and claims she breached this duty "by overseeing a discriminatory process biased against John."[48] Of course, both Southwestern and Dean Story vigorously disagree that they permitted discrimination against Plaintiff or failed to act with reasonable care. For purposes of this Motion, though, it is enough to point out that no Texas court has ever recognized an institutional or university employee duty under such circumstances. For that reason alone, Plaintiff's negligence claims must be dismissed as a matter of law.

Under Texas law, a negligence cause of action has three elements: "1) a legal duty; 2) breach of that duty; and 3) damages proximately resulting from the breach." *Van Horn v. Chambers*, 970 S.W.2d 542, 544 (Tex. 1998). "The plaintiff must establish both the existence and the violation of a duty owed to the plaintiff by the defendant to establish liability in tort." *Greater Houston Tramp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex. 1990). The existence of duty, however, "is a question of law for the court to decide from the facts surrounding the occurrence in question." *Id.* In this case, again, Plaintiff fails to identify a single piece of Texas precedent where a court found that a university or a university employee had a duty grounded in tort to not discriminate against him and/or comply with any contractual obligations. Those claims, to the extent they exist, are grounded in anti-discrimination statutes and breach of contract law.

Notably, there is a critical difference between the breach of a duty under a tort theory and the breach of a duty under a contract theory. "Tort obligations are those imposed by law when a person breaches a duty which is ***independent from promises made between the parties to a***

---

[47] Compl. ¶ 162.
[48] Compl. ¶ 166–167.

*contract*; contractual obligations are those that result from an agreement between the parties, which is breached." *Farah v. Mafringe & Kormanik, P.C.*, 927 S.W.2d 663, 674 (Tex. App.—Houston [1st Dist.] 1996, no writ) (citing *Sw. Bell Tel. Co. v. DeLanney*, 809 S.W.2d 493, 494 (Tex. 1991) (emphasis added). For negligence claims, "there must be a violation of a duty imposed by law independent of any contract." *Ortega v. City Nat'l Bank*, 97 S.W.3d 765, 777 (Tex. App.—Corpus Christi 2003, no pet.). Again, Plaintiff has failed to identify any such duty against either Defendant.

If Southwestern's conduct "would give rise to liability only because it breaches the parties' agreement, the plaintiff's claim ordinarily sounds only in contract." *See Villarreal v. Wells Fargo Bank, N.A.*, 814 F.3d 763, 767 (5th Cir. 2016). Plaintiff alleges negligence in Southwestern's investigation and adjudication of Plaintiff's disciplinary proceedings under the Student Sexual Misconduct Policy. These allegations merely restate the basis for Plaintiff's claim that Southwestern breached a contract with Plaintiff. There is no alleged violation of a duty imposed by law—only duty imposed by the Policy.

Regarding the negligence claims against Dean Story, Plaintiff's Complaint is devoid of a **single allegation** of wrongdoing attributable to her. In all instances, Plaintiff's Complaint makes plain that Dean Story complied with the University's Policy. She was not tasked with making determinations regarding Plaintiff's responsibility or the merits of his appeal.[49] Pursuant to the Policy, those roles were tasked to others.

Moreover, Plaintiff's negligence claim against Dean Story fails because, as a university official, she owed a duty to her employer, but not to any individual student, including Plaintiff. Federal courts around the country have specifically rejected negligence claims by students

---

[49] She was specifically precluded by the Policy from even attending the Hearing Board's deliberations.

claiming they were wrongly disciplined for sexual assault and that the university did not properly apply its policies. In *Austin v. University of Oregon*, 205 F.Supp.3d 1214, 1229 (D. Or. 2016), for example, a group of male students alleged that they were wrongfully disciplined for sexual misconduct and asserted a negligence claim against their university and university officials based on their allegedly flawed disciplinary process. The court rejected their negligence claim, finding that the university and its officials did not owe a duty to students accused of sexual assault because they did not have the required special relationship and because the university's goal was to reach just misconduct policy decisions instead of protecting the interests of any specific student.

Similarly, in *Doe v. Amherst College*, 238 F. Supp. 3d 195, 228 (D. Mass. 2017), Amherst College expelled a male student for violating the university's sexual misconduct policy, and the student brought a Title IX claim as well as a negligence claim based on allegedly biased disciplinary proceedings. The court rejected his negligence claim because the university and its officials did not have a legal duty "owed directly to students, relating to the implementation of student disciplinary proceedings." *Id.; see also Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 963 (N.D. Ill. 2017), *aff'd*, 933 F.3d 849 (7th Cir. 2019) (dismissing negligence claim relating to the implementation of student disciplinary proceedings because college did not have a special relationship with male student that imposed a duty of care).

## III.    Conclusion.

For the reasons stated above, Defendants respectfully request that this Court dismiss Plaintiff's Complaint with prejudice pursuant to Rule 12(b)(6).

Dated: July 13, 2021          Respectfully submitted,

**HUSCH BLACKWELL LLP**
111 Congress Avenue, Suite 1400
Austin, Texas 78701
(512) 472-5456
(512) 479-1101 (fax)

By: *Scott Schneider*
      Scott D. Schneider, *pro hac vice pending*
      Texas Bar No. 24054023
      scott.schneider@huschblackwell.com
      Paige C. Duggins-Clay
      Texas Bar No. 24105825
      paige.duggins-clay@huschblackwell.com
      Samuel P. Rajaratnam
      Texas Bar No. 24116935
      sammy.rajaratnam@huschblackwell.com

**ATTORNEYS FOR DEFENDANTS**

## <u>CERTIFICATE OF SERVICE</u>

   I certify that this Motion to Dismiss was served on the below-listed counsel of record for the Plaintiff via the Court's CM/ECF electronic filing system and/or by email transmission in accordance with the Federal Rules of Civil Procedure on July 13, 2021:

David Kenneth Sergi
david@sergilaw.com
Katherine Frank
katie@sergilaw.com
SERGI AND ASSOCIATES P.C.
329 S. Guadalupe St.
San Marcos, Texas 78666

Susan C. Stone
scs@kjk.com
Kristina W. Supler
kws@kjk.com
KOHRMAN JACKSON & KRANTZ, LLP
1375 E. 9th Street, 29th Floor
Cleveland, Ohio 44114

**ATTORNEYS FOR PLAINTIFF**

       *Scott Schneider*
       Scott D. Schneider